Love, Superintendent of Banks, *et al. v.* Dampeer *et al.*

(Division B. Jan. 26, 1931. Suggestion of Error Overruled Mar. 9, 1931.)

[132 So. 439. No. 28903.]

F. W. Bradshaw and Flowers, Brown & Hester, all of Jackson, and M. S. McNeil, of Hazlehurst, for appellants.

**Hardy Wilson** and **W. S. Henley,** both of Hazlehurst, for appellees.

438

440

Argued orally by **Clyde Hester** and **J. T. Brown**, for appellant, and by **W. S. Henley** and **Hardy J. Wilson**, for appellees.

**Ethridge, P. J.**, delivered the opinion of the court.

The appellants in charge of liquidation of the Crystal Springs Bank instituted suit against the appellees on a contract executed by them to the Crystal Springs Bank on October 20, 1926, at a time when the bank was a

going concern. The contract was made an exhibit to the bill of complaint and reads as follows:

"Whereas, the undersigned are stockholders and directors of the Crystal Springs Bank, Crystal Springs, Mississippi; and

"Whereas, the said bank has suffered certain losses on loans made by it, the exact amount of which losses cannot now be certainly defined; and

"Whereas, the State Banking Department of the state of Mississippi is calling upon the said bank to make good the paper in which losses appear, and it is necessary that the paper be made good or that assessments be made against stockholders to restore the capital of the bank and avoid insolvency; and

"Whereas, the undersigned as stockholders and directors desire to forestall any assessment against the stockholders and any demand against them as directors in charge of the bank's affairs and to prevent insolvency;

"Therefore, in consideration of the premises and in order to preclude any demands against us as directors and for the further consideration of forbearance on the part of the bank and of the State Banking Department to write off the amount of the losses at this time and of the agreement on the part of the bank to allow the time hereinafter mentioned, within which to reduce and avoid and define the losses in the paper listed on the attached sheet and marked 'Schedule No. 1, the undersigned jointly and severally agree and bind ourselves as follows, to-wit:

"1. We acknowledge ourselves bound to the Crystal Springs Bank in the sum of two hundred seventy-two thousand, six hundred sixty and 82/100 dollars ($272,-660.82), which amount we promise to pay as set forth herein below.

"2. The said amount shall be paid to cover ascertained losses in the paper listed on 'Schedule No. 1.'

"3. The said bank has agreed, with the approval of the State Banking Department, to carry to November 1,

1927, such of the paper loss on the said schedule as it may not collect in whole or in part.

"4. On or after the 1st day of November, 1927, the said bank shall advise the undersigned in writing of the losses in the paper listed on the said schedule which have been ascertained or realized, and within ten days after the furnishing of such information, the undersigned will pay to the said bank, in cash, the amount of losses up to the sum of two hundred seventy-two thousand, six hundred sixty dollars and eighty-two cents.

"5. Any paper which shall represent the losses shall upon such payment be assigned without recourse on the bank to the obligors. If, however, there is only a partial loss the assignment of the paper shall be subject to the right of the bank to retain the paper, and all security therefor, until it shall realize the amount or part thereof treated as being good and collectible. After the bank shall have thus realized on the paper to the extent of the amount thereof treated as good and collectible and has duly placed the credits thereon, the note or notes with the remaining securities shall be assigned without recourse to these obligors.

"6. The bank shall have the right, just as if this obligation had not been entered into by these obligors, at any time before any piece of paper is taken over by these obligors, to renew the same, rearrange the security, compromise it or deal with it in whatever manner the bank, through its managing officers, may deem best.

"7. The list of ascertained losses to be made good by the payment of the said two hundred seventy-two thousand, six hundred sixty dollars and eighty-two cents, or such part thereof as may be necessary to that end, shall be approved by the Superintendent of Banks, or by a bank examiner designated by the Superintendent of Banks for that purpose. The approval of such loss by the superintendent or by the designated examiner shall be conclusive and final as to all parties interested.

"8. It is the general purpose hereof to bind the undersigned to make good any losses to the Crystal Springs

Bank, not to exceed the sum of two hundred seventy-two thousand, six hundred sixty dollars and eighty-two cents, which may be realized or definitely ascertained in the manner provided herein in the paper listed on 'Schedule No. 1.'

"The Crystal Springs Bank in consideration of the execution and delivery to it by the obligors herein of this instrument, with approval of the State Banking Department, acting through the Superintendent of Banks, has agreed to carry until November 1, 1927, the paper listed on 'Schedule No. 1,' in its present, renewed, or rearranged form, and to handle the paper as above herein provided." To this was attached a list of the debtors of the bank with amounts owed by each of them dealt with in the said contract.

A resolution adopted at a meeting of the board of directors of the bank, called by a state bank examiner, was added to the bill, which resolution reads as follows:

"A meeting of the Directors of the Crystal Springs Bank, Crystal Springs, Mississippi was called at two o'clock, P. M., October 20, 1926, by L. E. Brown, state bank examiner. The purpose of the meeting being to discuss, with the directors, the loans and discounts of the Crystal Springs Bank, as of an examination at the close of business Oct. 18, 1926.

"The directors present as follows: A. S. Thomas, R. B. Thomas, J. M. Dampeer, L. M. Dampeer, Marion Dampeer, I. H. Barron.

"After a thorough analysis of the loans and discounts, the directors were advised by L. E. Brown, state bank examiner, that some form of security was necessary for certain lines carried by the bank, and that losses appeared in some of the lines, and that a correction of this condition was very necessary.

"It was proposed by the above directors that they personally guarantee such loans to the Crystal Springs Bank, Crystal Springs, Mississippi, guaranteeing the payment of such loans, and guaranteeing the Crystal Springs Bank,

against any loss occurring in these loans, and that the Crystal Springs Bank, be allowed further time in which to work out these loans if possible.

"The guaranty was prepared, attached to which a list of the notes guaranteed was attached, the guaranty signed by the directors present, and same forwarded to Mr. J. S. Love, Superintendent of Banks for his approval.

"The meeting then adjourned."

The bill was demurred to on many grounds, the amended demurrer containing twenty-two different grounds. In substance, the demurrer challenges the sufficiency of the bill because it does not state a cause of action; there is no equity jurisdiction in the bill; that an adequate remedy existed by law in the circuit court; that the alleged agreement sued on is illegal, null, and void; that said agreement violates sections 3852, 3802, 3807, 3810, 3836, 3849, 3795, 3797, and 3804 of Hemingway's Code 1927, and, being a violation of law, is void; that the said agreement is contrary to public policy, in that it has a tendency to cause certain public officers in charge of the banking department to neglect their official duties; and that it illegally permits the bank to carry assets deemed unsafe to banking when the duty of the banking department is to require the impaired capital stock to be restored in cash. The bill was also demurred to on the ground that the agreement is in violation of the statute of frauds (Hemingway's Code 1927, section 3325 (a), in that the list of debtors referred to in the contract as Exhibit No. 1 is not signed by the defendants in the suit; further, that there is no consideration shown to the agreement, and if there was any consideration it was an illegal one, and that the contract is a unilateral contract and lacks in mutuality; that the construction of said agreement shows on its face that it was not intended to be of any validity in the event of the failure or liquidation of the bank, but was only available to the said bank and

not negotiable or transferable, or subject to enforcement by a liquidator, receiver. or successor of the bank: that the complainants are not shown to have any right or interest in said agreement filed as Exhibit 1 to the bill which authorizes them to maintain a suit thereon: that the guaranty contained in the said contract was subject to the condition precedent: that said losses should be definitely realized and ascertained by the bank. which ascertainment was to be approved by the banking department. and there was no obligation until said losses should have been so realized and ascertained: and the bill shows on its face that this requirement had not been complied with. and many other specific grounds not deemed necessary to set out.

The chancellor sustained the demurrer, and dismissed the bill, from which this appeal is prosecuted. The chancellor rendered an opinion showing that he sustained the demurrer upon the theory that the contract was one of indemnity and also that it was in violation of the statute of frauds. that parol evidence could not be resorted to to identify the exhibit number one referred to in the contract. that the contract was in direct violation of public policies of the state, because it was executed to forestall the action and operation of law, and that the superintendent of the banking department had no power to approve such agreement, and it was his legal duty not to approve it; that the bank being under the supervision of said department, the superintendent could make no contract that had the effect to conceal its condition and mislead the public; that the superintendent could not permit the bank to operate under the agreement without violating his duty, and that the necessary effect of the contract to so approve was to deceive the public as to a status that did not exist.

A careful reading of the contract shows that the defendants assumed obligations of a definite and specific nature and kind and extent, and among the things it

agreed to was that on or after the 1st day of November, 1927, and within ten days after notice of losses to be ascertained by the bank, they would pay to the said bank cash amounting to the losses up to two hundred seventy-two thousand, six hundred sixty dollars and eighty-two cents; and that the paper representing said losses should be assigned to them without recourse on the bank. It was further agreed that if there is only partial loss the assignment of the paper shall be subject to the right of the bank to retain the paper, and all security therefor, until it shall realize the amount or part thereof treated as being good and collectible, and after the bank shall have thus realized on the paper to the amount thereof treated as good and collectible and has duly placed the credits thereon, the note or notes with the remaining securities shall be assigned without recourse to these obligors. It is manifest from a full and fair consideration of these obligations in connection with the contract that the contract was in effect a guaranty; that the paper guaranteed in Exhibit No. 1 would be paid in cash within ten days after notice of the conditions named in the contract; and that such paper would be assigned to the obligors, which is inconsistent with the contention that the bank was under duty to exhaust the remedies against the makers of the debts guaranteed by the obligors. As to the consideration, it is manifest that there was adequate consideration. The obligors were officers and directors of the bank and were called upon by the banking department to make good certain securities held by it, deemed by the banking department to be inadequate to render the bank solvent. The banking department was threatening to call upon the stockholders to pay in their liability on the stock to the face value thereof, or to whatever part was necessary to make the capital good or to restore it. In addition to this, the bank might be closed and thus loss would fall upon both the bank and the stockholders thereof, and possibly suits would be brought against the directors for

negligent management of the bank. This was sufficient consideration for the contract.

As to the contention that the contract violated the statute of frauds because Exhibit No. 1, or schedule No. 1 referred to in the contract, was not signed by the obligors under the contract, we are of the opinion that the reference in the contract to schedule No. 1 attached to the contract was a sufficient reference to the exhibit to authorize parol proof, if necessary, as to the correctness of the exhibit so attached, under the case of Wilkinson v. Taylor Mfg. Co., 67 Miss. 231, 7 So. 356, and also the cases of Waul v. Kirkman, 27 Miss. 823; Fisher v. Kuhn, 54 Miss. 480; Gulfport Cotton Oil, Fertilizer & Mfg. Co. v. Reneau, 94 Miss. 904, 48 So. 292, 136 Am. St. Rep. 607; Willis v. Ellis, 98 Miss. 197, 53 So. 498, Ann. Cas. 1913A, 1039; and 25 R. C. L. 649. We fail to see how the contract entered into between the bank and the obligors violates any public policy or any statute of the state. The contract was between the bank and its directors and officers. The debts listed in the schedule to the contract were deemed by the banking department to be insufficient, but when they were guaranteed by solvent persons, we fail to see how it would affect any public policy if the officers and directors of the bank, whose solvency had been endangered through its management, should undertake to guarantee the paper thereof so as to insure the bank's solvency and continued operation. There is nothing in the contract as we read it that would prevent the banking department from exercising its duties and functions whenever the bank should again become insolvent or in an unsafe condition. It was deemed by the banking department and by the bank and by the obligors that this guaranty would render the bank solvent, and the paper of face value, or at least of the value stated in the contract during the period of time mentioned. If so, why should the bank be closed, or why should the stockholders be called on to pay addi-

tional money into the bank on the theory that its solvency was endangered. thereby making it precarious for the bank's continued existence? As we see the contract. it was accepted by all parties in good faith under the belief that the guaranty of the obligors. they being men of property. was sufficient to make the bank solvent. There is nothing to show that during the twelve months the bank was not in fact solvent. having this guaranty among its assets with the right to call upon them to pay any losses that might be found to exist in the security guaranteed.

The demand was not made upon the guarantors within the twelve months or until after the bank had been taken over by the banking department for liquidation, when it was discovered that these securities were not sound at that time and a call was made upon the guarantors to comply with their contract. It must be remembered that the contract was between the bank and its board of directors. that the obligors on the bond were managing the affairs of the bank, some of them being in active charge as officers and others in charge as directors charged with the duty of knowing the condition of the bank. and the failure of some of the guarantors to give notice to themselves and others cannot prejudice the rights of the banking department as liquidating agent to effect compliance with their obligation. The contract expressly authorized the manager of the bank or the officers of the bank to ascertain the condition of the paper guaranteed on or after the 1st day of November, 1927. It was not to be done by a particular date, but it was to be done, and the banking officers and the directors of the bank charged with the duty of acting for the bank and seeing that it discharged its functions as a bank should not be allowed to complain of delay in giving them the notice, so far as the bill shows. If there is anything that can be set up in that regard, it is in things that do not inhere in the contract, and of course could not be raised by demurrer.

We think the banking department, after taking the bank over for liquidation, had the right to determine the status of the paper the same as the bank had, and to assert the rights the bank had under the contract to the same extent the bank could; and that from the nature of the accounts involved and the allegations of the bill it would require some training in accountancy to determine exactly what the status and condition was, and it was peculiarly within the jurisdiction of the chancery court to hear and determine this cause. We are of the opinion that the bill states an equitable cause of action, and that the learned court below was in error in dismissing the bill. The judgment will be reversed, and the cause remanded.

Reversed and remanded.